Robert NEMEROFF, D. D. S., Plaintiff,

v.

Alan ABELSON, Meyer Berman, Robert Bleiberg, Cumberland Associates, Dow Jones & Company, Inc., Walter Mintz, Robert Wilson, Robert Wilson Associates, Defendants.

No. 77 Civ. 1472 (RLC).

United States District Court,
S. D. New York.

April 18, 1979.

Hale & Dorr by James D. St. Clair, David S. Mortensen, and Richard A. Johnston, Boston, Mass., Edward Nathan, New York City, for plaintiff.

Patterson, Belknap, Webb & Tyler by Rudolph W. Giuliani and Renee L. Cohen, New York City, Reavis & McGrath by Stephen R. Steinberg and Andrew C. Freedman, New York City, Kaye, Scholer, Fierman, Hays & Handler by Julius Berman, New York City, David & Finell by Jack David, New York City, for defendants.

## OPINION

ROBERT L. CARTER, District Judge.

*The Nature of the Motion and the Issues Involved*

This litigation commenced on March 25, 1977, with the filing of a complaint against Alan Abelson, Meyer Berman, Lawrence and Robert Bleiberg, Boxwood and Cumberland Associates, Marc Howard, Marc Howard Associates, Walter Mintz, Robert Wilson, Robert Wilson Associates, and Dow Jones & Co., Inc., alleging violations of §§ 9(a) and 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78i(a) and 78j(b). Abelson, Robert Bleiberg, and Dow Jones ("publishing defendants") are respectively: the author of *Up and Down Wall Street*, a column regularly published in Barron's analyzing stock traded on the various exchanges; the editor of Barron's National Business and Financial Weekly ("Barron's"), a weekly journal covering financial news; and corporate owner-publisher of Barron's and other publications. The other defendants will be called the short sellers. The complaint alleged that the short sellers engaged in a conspiracy with the publishing defendants pursuant to which the publishing defendants would advise the short sellers of the forthcoming publication in Bar-

ron's of unfavorable or disparaging news about Technicare Corporation ("Technicare"). The articles were allegedly intended to depress the price of Technicare stock, enabling the short sellers to take a short position on Technicare and, after the articles were published, to cover their purchases at a lower price.

Shortly after the commencement of the litigation, plaintiff discontinued with prejudice the action against Lawrence Bleiberg, Boxwood Associates, Marc Howard and Marc Howard Associates. On January 6, 1978, an amended complaint with materially altered allegations was filed against the remaining defendants. The short sellers were now alleged to have solicited the publishing defendants to write and publish negative and disparaging news about Technicare, and the Barron's publications containing the negative articles were cited as those dated May 3, June 14, July 19, August 16, and October 11 in 1976 and January 10, January 17, and February 14 in 1977.

On May 3, 1978, a stipulation and order of dismissal with prejudice of the entire action was filed. It provided that the dismissal would be effective on June 15, 1978, unless prior to that date defendants moved for an order seeking costs, reasonable expenses and attorneys' fees, in which case the dismissal would be effective on the date the court issued its order determining the motion. The defendants filed the instant motion seeking costs, expenses and attorneys' fees on June 14 and oral argument was heard on the motion in September. Additional documents and memoranda were filed thereafter,[1] and the defendants have filed affidavits detailing the fees and expenses which they seek to recover as follows: Berman $12,210 in fees and $2,149.26 in disbursements; the publishing defendants $194,629 in fees (of which $53,058 constitutes costs in connection with their fee application) and $6,163.37 in disbursements; Cumberland Associates and Mintz $32,428.75 in fees and $2,781.85 in disbursements for defense of the action and $4,413.25 in fees and $175.18 in disbursements in connection with the fee application; Robert Wilson and Robert Wilson Associates $43,744 in fees and $4,132.33 in disbursements in defense of the action and $9,434 in fees in connection with this motion.

Defendants contend that this suit was instituted without any basis for the damaging allegations made herein. They argue that the claims are frivolous and that the plaintiff's real purpose in bringing this action was attempted use of the judicial process to silence the publishing defendants. Defendants further allege that plaintiff was guilty of dilatory and wasteful tactics during the course of the litigation causing defendants needless expense,[2] and that the circumstances of this case conclusively demonstrate the bad faith of plaintiff and his counsel in instituting the lawsuit. Defendants urge that they are entitled to an award of attorneys' fees and expenses pur-

---

**1.** At the close of the September, 1978 hearing, counsel were told to make certain that all documents in support of their contentions were filed with the court. Thereafter, both sides submitted additional documents, and Hale & Dorr filed an additional memorandum. Hale & Dorr next engaged the services of Paul, Weiss, Rifkind, Wharton & Garrison ("Paul, Weiss") and through its new counsel sought to start another round of filings. The court, taking the position that the court and counsel had understood that the matter had been fully briefed and argued as of the September hearing, refused to allow further filings on the motion. When the submissions were studied preparatory to the writing of this opinion, I found that the defendants had failed to provide any specific figures in respect of the attorneys' fees and expenses which they sought to recover, and the court requested that such information be supplied. Plaintiff took the position that requesting and accepting this data was inconsistent with the court's earlier refusal to accept additional filings from the plaintiff. In the course of this exchange, the court learned that one of the documents it had previously refused to accept was a supplemental affidavit from Jeffrey Haas of the New York Stock Exchange. Since plaintiff's counsel's dealings and conversations with Haas are important considerations in determining the instant motion, the court asked counsel to refile the affidavit, and as will be seen, the supplemental statement has been considered.

**2.** In view of the court's approach to decision on the motion, this issue need not be discussed.

suant to Rules 11 and 54(d), F.R.Civ.P., § 9(e) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78i(e) and the inherent equitable power of the court.

Plaintiff maintains that the action was based on a legitimate perception of a manipulative scheme by defendants and was commenced in good faith to redress injuries to him and to other Technicare shareholders. He argues that any reliance on the First Amendment is misconceived since the press is not protected if it engages in illegal activities.[3]

■ Three threshold points should be made. First, while this is not a First Amendment case, it is not inappropriate for the publishing defendants to argue that the court should not allow a party to misuse judicial processes as a vehicle for restricting the exercise of defendants' First Amendment rights. Second, although the basic issue in this case is whether plaintiff had any colorable good faith basis for instituting this action in March, 1977, when the lawsuit was commenced, the defendants' motion must fail if plaintiff had such a colorable claim at any point during the life of this litigation. Finally, the showing of a lack of an adequate foundation for bringing defendants into court is not in and of itself sufficient to warrant taxing the plaintiff and his counsel with expenses and attorneys' fees.

### The Genesis of this Litigation

In an article published in May, 1976, Alan Abelson questioned whether Technicare's high priced medical technology could continue to be marketed successfully enough to warrant future growth in the value of the company's stock. Thereafter Abelson's articles contained additional negative comments on Technicare's capacity for accretion. Herbert Stein, a client of Hale &

Dorr, counsel for plaintiff in this action, held a large position in Centronics Data Computer Corporation ("Centronics"), another company about which Abelson was beginning to write negatively. Stein, in the belief that Centronics was being manipulated by Abelson and various short sellers, sought advice from Hale & Dorr on how to put a stop to this. Gordon Walker, the member of the firm handling this litigation, undertook an investigation of that matter sometime in January, 1977, and in the course of that investigation met Howard Roth, a broker at Prescott, Ball & Turbin. Roth and several of his clients including plaintiff had substantial holdings in Technicare. The stock had risen spectacularly at first and then had begun to level off. Roth was convinced that Abelson's negative comments published in Barron's in 1976 (and subsequently in 1977) were not honest appraisals but part of a conspiracy to depress Technicare's stock. Plaintiff shared this conviction, and Roth and Nemeroff consulted Edward Costikyan of Paul, Weiss, Rifkind, Wharton & Garrison in December, 1976, to discuss the possibility of litigation. Costikyan would not take the suit.[4] Stein suggested Hale & Dorr as an alternative, and Roth suggested Nemeroff to Walker as a possible plaintiff in whose name class action litigation could be instituted. Walker and the plaintiff talked by telephone but never met face to face prior to March 25, 1977, the date this complaint was filed.

Plaintiff alleges that although "virtually every knowledgeable person with whom counsel spoke believed Technicare to have strong 'fundamentals,' . . . the stock was being besieged, without objective reason" by both Abelson's negative articles and "an extraordinary program of short selling in Technicare stock." (Pl.Mem. p. 7). As a justifiable basis for instituting this litiga-

---

3. This latter statement, however, seems to beg the question. It is doubtful that plaintiff would have consented to a stipulation of dismissal with prejudice with knowledge that defendants would press for costs and attorneys' fees, if there were on hand sufficient indices of illegality to support the allegations of the amended complaint.

4. This is not to indicate that Mr. Costikyan suggested Hale & Dorr, or to imply any disbelief in plaintiff's assertion that Costikyan refused to accept the assignment because of a potential conflict of interest.

tion, Walker points to an ongoing investigation by the New York Stock Exchange ("N.Y.S.E.") and the Securities & Exchange Commission ("Commission") in 1977. He states that he was told by an official of the N.Y.S.E. that there was no doubt of the relationship between Abelson and the short sellers and that N.Y.S.E. had charted Wilson's sales against Abelson's columns from which one could conclude some correlation.

"In addition to the above, plaintiff's counsel interviewed or spoke to numerous Technicare investors, Technicare officials, knowledgeable journalists, and attorneys for and investors in companies other than Technicare which had experienced the same 'bear raid' by the same funds and short sellers and which had experienced the same negative treatment in Mr. Abelson's column." (Pl.Mem. p. 11).

### The Walker Affidavit

In his affidavit, Walker states that his involvement began on January 14, 1977, at the behest of Herbert Stein. Stein had been told that Wilson had solicited Abelson to write a number of negative articles on Technicare in 1976 and that Wilson and others had established short positions in Technicare. At the time, Wilson had also established a substantial short position in Centronics. The affidavit goes on to say that Walker and his partner, Norman Asher, called the N.Y.S.E. and the Commission, and each agency advised them that Abelson's relation to Wilson and other short sellers was being investigated. Stein indicated that Gale Donovan and Roth had a great deal of information on Technicare. When Walker spoke to Donovan and Roth, they confirmed the belief of a working relationship between the short sellers and Abelson and stated that they had complained to the N.Y.S.E. and the Commission. Donovan stated that she had knowledge that Lawrence Bleiberg, managing partner at Boxwood Associates and brother to the editor of Barron's, had sold Technicare short through Boxwood, and had covered Boxwood's position at a profit after Abelson's negative column appeared.

Walker then called Robert Bleiberg at Barron's and said that he had information that a forthcoming issue of Barron's was going to contain negative comments on Centronics and asked that such adverse comment be deleted. Bleiberg was abusive and referred him to the firm that is his counsel in this litigation. Walker then spoke to Robert Potter, a member of the firm who, Walker says, refused to take any action. Potter indicates that he asked Walker to meet with him to discuss the matter, but Walker never acted on this invitation.

In January, Walker talked to Richard S. Grimm, President of Technicare, and subsequently to Allan Somer, Technicare counsel. On February 3, 1977, he spoke to Jeffrey Haas of N.Y.S.E. who told him that N.Y.S.E. had prepared a chart correlating the relationship between Abelson's columns and the build up of the positions by the short sellers. Haas is said to have told Walker in that conversation that there was no doubt of the relationship between the short sellers and Abelson, and that Wilson's trading and Abelson's columns were correlated. On February 8, 1977, Walker met with Haas and other N.Y.S.E. personnel engaged in investigating the allegations against the defendants. At this meeting, the N.Y.S.E. official in charge of the investigation stated that he was satisfied that no manipulation of Technicare had occurred. Walker also conferred with officials of the Commission on February 8, 1977, and they informed him that an investigation by the Commission was underway.

Walker met with Roth on several other occasions, and the latter advised him of various negative rumors that Roth said were being circulated by short sellers to depress the price of Technicare stock. Walker went over the draft of the complaint with Roth who made a number of suggestions which were adopted.

Walker met with persons interested in a company called International Systems and Controls ("ISC") and was told that a Howard Sirota had written a negative analysis of ISC in 1974 which had been distributed

to Robert Wilson and Marc Howard among others, and that Wilson and Howard had thereafter taken short positions on ISC; that Dow Jones carried negative, inaccurate and misleading information on ISC. Walker states that he considered this information as corroborating Barron's relationship to a small group of short sellers. He obtained copies of recommendations of many major New York firms on Technicare and the "almost universal consensus was that the company was sound fundamentally and had a substantial technological lead over its competitors." The one exception was Lawrence Rader of Loeb, Rhoades & Co., a friend of Robert Wilson.

## Walker's Conversation with Grimm

On March 14, 1977, two weeks before the suit was filed, Walker had a conversation with Grimm, President of Technicare. Apparently, Walker did not know the conversation was being recorded. In the course of that conversation, Grimm indicated that he did not wish to get involved in a lawsuit without proof to back it up, for fear of damaging Technicare's credibility. Walker assured Grimm that he would not institute suit if he were not satisfied beyond a reasonable doubt that the defendants were guilty of the activity alleged. In that conversation Walker acknowledged the potential damages to the publishing defendants in charging them with a manipulation of Technicare stock to aid various short sellers in making a profit.

## The Litigation Commences

On the day suit was filed, Jack Egan, a newspaper reporter, telephoned Barron's to speak to Abelson, and the call was referred to Bleiberg since Abelson was out for the day. Bleiberg returned the call between noon and 2:00 P.M. and was told that Egan had a copy of the complaint and wanted to talk about it. Bleiberg then sent an office assistant to the courthouse to obtain a copy of the complaint. The assistant reported that he had made several visits to the courthouse to be told that no such complaint had been filed. Later, he obtained a copy and

the clerk's notation indicates that the complaint was filed at 3:38 P.M.

## Determination

### I

This lawsuit was instituted based on very strong convictions of wrongdoing, but it was a conviction colored by greed. Those with large positions in Technicare were certain that Abelson's negative columns and the apparent successful maneuvering of the short selling defendants constituted a conspiratorial combination. Walker, however, is a lawyer. In his conversation with Grimm he acknowledged a professional responsibility to have a factual and legally supportable basis for instituting litigation which charges the publishing defendants with printing biased and dishonest reports, and he recognized the potential for harm to these parties in disseminating such charges.

There is a strong, indeed, an all but irrebuttable presumption, based on the facts leading to the institution of this action, that the filing of this lawsuit without being certain that the charges could be proved and the wide dissemination of the damaging allegations were done with conscious deliberation. The evident purpose was to secure maximum publicity harmful to the publishing defendants. Under the circumstances, plaintiff's and Walker's good faith becomes critical.

Counsel's client, Herbert Stein, along with Roth, Donovan and plaintiff, were convinced that Abelson's adverse comments were a deliberate attempt to depress the price of Technicare stock to enable the short selling defendants to manipulate the stock at a profit. These were the assessments of parties who stood to lose if Technicare or Centronics stock declined. Before this litigation commenced, however, neither the plaintiff, his counsel, Roth, nor Stein had one iota of proof—in the sense that term is defined in a court of law—that Abelson was leaking any information to the short selling defendants. Walker points to ongoing N.Y.S.E. and S.E.C. investigations as providing disinterested support for the allegations in the complaint, but these in-

quiries were generated by the same partisans who had been the initial source of his belief that the defendants were conspiring to manipulate Technicare stock. Moreover, some weeks prior to the date the complaint was filed, the N.Y.S.E. had concluded that the charges lacked substance, and Walker was informed of a tentative conclusion to that effect as early as February 8.

The decisions to file the lawsuit solely on the basis of unsupported gossip and inadmissible hearsay and to supply copies of the pleadings to the press even before the complaint was actually filed severely compromise Walker's assertions of good faith. While it seems clear enough that the plaintiff, Roth, and others believed that Abelson was guilty of the wrongdoing charged, Walker knew that the allegations had to be supportable to stand up in court.

Moreover, a few days before the lawsuit was filed, plaintiff's counsel was asked by Robert Sack, a member of the firm representing the publishing defendants, to share with him any evidence Walker uncovered about leaks from Barron's to investors. While there was no obligation to meet with Sack, Walker, as a competent attorney, must have realized the weakness of the "facts" he had to back up his claims, and a discussion with defendants' counsel might have afforded him a sufficiently feasible basis to resist Roth's and Stein's insistence that this suit be filed. At any rate, prudent, ethical counsel would not have begun this litigation with the meagre facts Walker possessed in March, 1977.

The suit was filed either with the knowledge that counsel had no adequate factual basis to sustain the allegations or in reckless disregard of the fact that proof of the charges was not available. In either circumstance, plaintiff and his counsel knowingly proceeded with litigation that lacked foundation. Clearly, the purpose could not have been to litigate on the merits. Indeed, the only rational inference to be drawn is that plaintiff's and his counsel's real objective was the public airing of the damaging allegations against the publishing defendants—an objective achieved with the filing of the complaint. While Walker alleges that he investigated the matter prior to bringing the action at the time the complaint was filed, he had on hand neither documentary proof of the allegations nor testimony admissible in a trial record to prove the "facts" alleged.

Walker states that in his conversation with Haas on February 3, Haas told him that there was no doubt of Abelson's relationship to the short sellers and that a N.Y.S.E. chart evidenced that correlation. Haas denies the statement, and the charts fail to show the suggested correlation. In a subsequent affidavit, Haas states that while he does not recall making several of the statements attributed to him, "in the context of the entire discussion I can understand how [Walker] could come away from the conversation with a good faith impression that I had made such statements." Haas' supplemental affidavit suggests that the totality of his conversation with Walker might have given the latter the good faith, albeit mistaken, impression that N.Y.S.E. had found data supporting the allegations. I accept that possibility, but whatever impression Haas may have imparted to Walker on February 3 is immaterial.

Walker was advised on February 8 by the N.Y.S.E. official responsible for investigating the charges filed with N.Y.S.E. against the defendants (which track those alleged in the complaint filed here) that the N.Y.S.E. investigation thus far did not support any charges of manipulation. It is noteworthy in this connection that Walker refers to no further contact or communication with the N.Y.S.E. after February 8, even though the complaint was not filed until March 25. Assuming that he did not understand the N.Y.S.E. February 8 message that the charges against defendants had not been substantiated, had he thereafter been in touch with N.Y.S.E. officials, he would have been advised that the investigation had been concluded with the finding that there was no basis for the allegations of conspiratorial manipulation, and that the N.Y.S.E.'s chart comparing short seller activity and Abelson's articles had failed to

show the existence of the alleged nexus between the two. Since Walker seeks support from what the N.Y.S.E. had told him, his failure to discuss the matter with them after February 8 undermines further this assertion of good faith. The gravity of the course Walker planned made caution essential.

■ The ultimate question concerning taxing of attorneys' fees and expenses as costs against plaintiff and/or his counsel under Rule 11, F.R.Civ.P., § 9(e) of the Securities Exchange Act of 1934, 15 U.S.C. § 78i(e) or the court's equitable power is whether the plaintiff and/or counsel instituted the action "in bad faith, vexatiously, wantonly or for oppressive reasons." *Browning Debenture Holders' Committee v. DASA Corp.*, 560 F.2d 1078, 1087 (2d Cir. 1977); *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 210, n. 30, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).

■ The publishing defendants occupy a unique position. Their business cannot survive without a reputation for independence, honesty, integrity, good faith and fair reporting in respect of the financial analyses published under their imprimatur. Plaintiff's counsel was conscious of the fact that unsupported allegations that these defendants were biased and had deliberately misinformed the public, was an attack on Abelson's, Bleiberg's and Barron's integrity and credibility for objective financial analysis, and as such had the potential to destroy Abelson's and Bleiberg's professional reputations and do damage to Barron's as a successful commercial enterprise. Nonetheless, this action supported only by gossip and hearsay was commenced, and its very purpose appears to have been to injure the publishing defendants. While Walker's yardstick of proof beyond a reasonable doubt, stated in his March 14 conversation with Grimm, is a more rigid standard than is required, that conversation convinces the court that counsel knowingly and with malice began this baseless lawsuit.

The insubstantial character of the evidence relied upon can be gleaned from the passages from Walker's affidavit set forth in the margin.[5] In that lengthy affidavit

---

5. "Ms. Donovan stated that she had knowledge that a hedge fund which had sold Technicare short was managed by the brother of the editor of *Barron's* and that that fund had 'covered' its Technicare position at a profit after a negative Abelson column relating to Technicare." (Walker Aff. p. 3)

Walker cites various meetings with Howard Roth who "reported various negative rumors relating to Technicare which, according to him, were being circulated around Wall Street by short sellers in order to manipulate downward the price of Technicare stock. He supplied me with a copy of the transcript of his testimony before the NYSE, giving specific information with respect to certain such rumors and relating to the activities of the short sellers." (Walker Aff. pp. 9–10)

Ms. Donovan said she had learned from an Ed Stassler related by marriage to the Bleiberg family that Boxwood Associates "had sold Technicare short in advance of an Abelson column." Later, "Stassler informed her that Boxwood had covered its short position at a substantial profit." (Walker Aff. p. 10) "Ms. Donovan said that Stassler had informed her that the manager of the Boxwood hedge fund was Lawrence Bleiberg, the brother of the editor of *Barron's*." (*Ibid.*)

He describes a February 10, 1977 meeting with Charles Reed and Jay Westbrook, attorneys for ISC, Ray Hofker, ISC vice president and general counsel, and Herman Frietsch, ISC chief financial officer (Walker Aff. p. 11):

"The ISC people related a series of events tending to tie together certain short sellers and Mr. Abelson. They informed me of the existence of the 'Concept Club,' a group of money managers who met regularly to discuss certain stocks. They identified as members Robert Wilson, an employee of Marc Howard and a partner in a brokerage firm (Furman, Selz, Mayer, Dietz & Birney, Inc.) of which Wilson, Howard and Mintz were major clients. They told me that a man named Howard Sirota, an employee of the Furman, Selz brokerage firm, had written a negative analysis of ISC in 1974 which had been distributed on a very limited basis to certain clients including Robert Wilson and Marc Howard. They stated that Wilson and Howard took short positions in ISC late in 1974 and that in January, 1975, Mr. Abelson's column contained a negative analysis of ISC which followed almost verbatim the Sirota report." "Frietsch and Hofker told me that ISC had been continually 'mistreated' over the prior two years by Dow Jones, which had carried inaccurate and misleading negative material over its wire service and which had refused to carry positive news relating to ISC. (Similar claims had been made both by Mr. Roth and Mr. Grimm with respect to Technicare.)"

and its supplement the only conceivably admissible items of evidence cited are: (1) the log entries of a Mr. Lau showing trading by short sellers in advance of Abelson's column

"I considered the information relating to ISC to be significant as independent corroboration of the relationship between *Barron's* and a small group of short sellers and because of my belief that the actions of the short sellers and Mr. Abelson relating to Technicare or Centronics must be examined in the context of prior manipulations of other securities." (Walker Aff. p. 12)

"On March 8, 1977, Mr. Rudman and I met once again with Messrs. Hofker and Westbrook. We were furnished by them with a list (several years old) of partners sharing in the profits of the Boxwood hedge fund. The list included Lawrence Bleiberg, the brother of the defendant Robert Bleiberg, the editor of *Barron's*, and their father. Also included as a partner was an entity known as 'CAO Enterprises, c/o Albert Abelson.' The ISC people also provided me with copies of entries in a log prepared by a Mr. Lau, an officer of ISC, detailing on a day-to-day basis a continuing attack on ISC shares by short sellers and containing information of trading by short sellers in advance of Abelson's columns." (*Id.* p. 13)

.  .  .  .  .

"Prior to filing the complaint in this action, I obtained copies of numerous 'buy' recommendations relating to Technicare and generated by a number of major New York firms, including White, Weld and Paine, Webber, Jackson & Curtis. The almost universal consensus was that the company was sound fundamentally and had a substantial technological lead over its competitors. Virtually the only published opinion contrary to this (other than Mr. Abelson's) was that of Lawrence Rader of Loeb, Rhoades & Co. I was informed by Mr. Roth that Mr. Rader was a friend of Robert Wilson's and that indeed Wilson had 'done a favor for Rader' at about the time of Mr. Rader's issuance of his negative report on Technicare (March 1976) by buying from him some stock in a company called Tri-Chem, which stock was subject of transfer restrictions. (Although Mr. Rader's deposition was never taken, the production of documents by Loeb, Rhoades included notes of telephone conversations between Rader and Wilson during the relevant time in which the only stocks discussed were Technicare and Tri-Chem)." (*Id.* pp. 18–19)

.  .  .  .  .

"Prior to the institution of this action (and continuing after the complaint was filed), I received from numerous persons a great deal of additional 'information' relating to trading in Technicare, activities of the short sellers, alleged family or other personal relationships between *Barron's* personnel and various hedge funds, alleged financial interest of various Barron's personnel in certain stocks, alleged secret investment or bank accounts of certain Barron's personnel, the suggestion that a compa-

ny-wide conspiracy at Dow Jones affected wire service reports relating to certain securities and the content of articles appearing in the *Wall Street Journal*, the participation by the NYSE specialist in Technicare in a conspiracy to drive down Technicare stock prices and the participation in such a conspiracy of certain analysts and traders (as well as many other matters). In each instance I took steps to investigate such allegations and as to most of them I found no basis or support. As a consequence, these matters were disregarded." (*Id.* at p. 21)

In his supplemental affidavit Walker continues to recite rumor or other "facts" that would be clearly inadmissible in a trial record:

"Mr. Stein informed me in January, 1977 that a man named John Berry had a great deal of knowledge with respect to the relationship between Alan Abelson and certain short sellers. He told me that Mr. Berry was a financial writer with the *Washington Post* and that he had previously been employed by *Business Week* magazine."

"I spoke with Mr. Berry by phone on several occasions in January and February, 1977. Mr. Berry told me that he had written a *Business Week* article relating to the manipulation of the stock of American Agronomics. He said that the article contained the statement that a stock market speculator named James Corr III claimed to have 'a golden news leak' and claimed 'often [to know] in advance what Alan Abelson, the *Barron's* columnist will be saying.' Corr was also quoted as stating that a 'small group close to Abelson was also feeding *Barron's* positive stories [on other companies] and that he 'was told in advance that the stories were coming.' I obtained and read a copy of such article." (Walker Supp. Aff. p. 1)

"Mr. Berry told me that the *Business Week* article had been thoroughly researched prior to its publication, and that the statements quoted were accurate. He told me that the article had resulted in a libel suit brought by Dow Jones against McGraw-Hill, the publisher of *Business Week*. Mr. Berry told me that the libel suit had been settled without payment of any sum by McGraw-Hill when Mr. Abelson refused to allow discovery of his files relating to certain columns and when the accuracy of the *Business Week* article was conclusively established through discovery. Mr. Berry suggested that I speak with the attorneys for McGraw-Hill." (Walker Supp. Aff. p. 2)

.  .  .  .  .

"Pursuant to the suggestion of Mr. Berry, Mr. Rudman and I met on February 10, 1977 with Todd Sollis of White and Case, the firm which had represented *Business Week* in the McGraw-Hill/Dow Jones libel litigation. Mr. Sollis confirmed the statements which had been made by Mr. Berry and identified Robert

on ISC, provided these entries were deemed admissible as showing the short selling activities of the defendants in stock other than Technicare and as a basis for introducing Abelson's columns concerning ISC; (2) copies of numerous buy recommendations relating to Technicare; (3) testimony showing that John Berry had authored articles in Business Week relating to the manipulation of the stock of American Agronomics, that the article had been thoroughly researched, and that the quoted statements from the article were accurate (but objection to this testimony on grounds of relevance would probably be sustained), (4) Marc Howard's corroboration of the existence of the Concept and First Thursday Clubs and identifying the various defendants belonging to these groups; (5) written materials from the McGraw-Hill/Dow Jones litigation and, excerpts from the deposition of Alan Abelson; (6) Sirota's statement that he had written the negative analysis on ISC and supplied Robert Wilson with a copy.

Only two of these items would be clearly admissible in this case—the buy recommendations and Howard's statement of the existence and membership of the Concept and First Thursday Clubs. There are other pieces of arguably admissible evidence in Walker's affidavit: the statement of Robert Wilson in the Wall Street Journal, Abelson's statement in Business Week, and testimony concerning Walker's conversation with Robert Sack and Bleiberg. None of these, however, appears to be very helpful in substantiating the claims made, and none is a sufficient foundation on which to base this litigation or to establish plaintiff's and counsel's bona fides in bringing this action.

Walker knew or should have known that the gossip which he recites in his affidavit is not evidentiary proof. He understood that the damage to the reputation and credibility of the publishing defendants could have been devastating, if those who read

---

Wilson, Marc Howard and Meyer Berman as short sellers close to Mr. Abelson. He informed us that a man named Howard Sirota had written a negative analysis of International Systems and Controls which had been the basis for Abelson's first column relating to that company. (His information with respect to Mr. Sirota was perfectly consistent with that which I received from International Systems and Controls, See Affidavit of Gordon T. Walker dated August 7, 1978). Mr. Sollis stated that during his preparation of the libel suit he had received certain tips with respect to the content of forthcoming columns of Mr. Abelson and that in at least two instances the column did, in fact, appear. Mr. Sollis also told us of the existence of the 'Concept Club' or 'First Thursday Group' and identified certain of its members. Again, his information was consistent with that which I received from International Systems and Controls people. It was also corroborated by a statement made by Marc Howard after the commencement of this litigation identifying as members Robert Wilson; Howard's assistant Marty Pearlman; and Ezra Mager, a partner in Furman, Selz, Mager, Dietz & Birney, Inc. which numbered among its clients Messrs. Wilson, Howard and Mintz. In addition, Mr. Sollis provided us with written materials from the McGraw-Hill/Dow Jones litigation including a transcript of the deposition of Alan Abelson and certain affidavits submitted in connection with the motion of McGraw-Hill to dismiss. These materials constitute direct evidence of the relationship between Mr. Abelson and cer-

tain short sellers with respect to certain securities other than Technicare." (*Id.* at pp. 2–4)

. . . . .

"On March 17, 1977, I met in New York with Howard Sirota. Mr. Sirota had previously been employed by Furman, Selz, Mager, Dietz & Birney, Inc., the brokerage firm of which Messrs. Wilson, Howard and Mintz were clients. Mr. Sirota confirmed that in the fall of 1974 he had written a negative analysis on International Systems and Controls ('ISC'). He said that the report had not been generally circulated but had been supplied to Robert Wilson, who, according to Mr. Sirota, established a short position in ISC prior to January, 1975. Mr. Sirota also confirmed that Mr. Abelson's January, 1975 column relating to ISC was taken in large part from his report."

"Mr. Sirota said that he knew certain of the individuals named as defendants in this case. He identified Mr. Wilson as being short in Technicare and said that Wilson has generated many 'ideas' for Alan Abelson. He said that there was a small group of hedge fund managers who regularly agree among themselves which stocks are to be sold short and who are able to cause the publication of negative information relating to such stock in Alan Abelson's column."

"Mr. Sirota identified for me brokerage firms trading for Mr. Wilson and identified the investment firms which, according to him, most often provided the necessary stock loans which enabled the hedge funds to sell such stocks short." (*Id.* pp. 4–5)

Barron's and Abelson's articles believed the allegations.

Because public access to the courts is a paramount priority, a litigant must be given a great deal of leeway, lest legitimate claimants become unduly timid in airing their complaints in a judicial forum. On the other hand, it is not a legitimate use of the court process to institute baseless litigation to silence or discredit the press.

This litigation was surely commenced against the publishing defendants with malice. To make and disseminate allegations such as those made here without the slightest assurance that plaintiff's burden of proof could be met, when it is known or should have been known that no hard facts but only rumor and gossip support the charges, constitutes the essence of bad faith. Accordingly, I find that plaintiff and his counsel in instituting this action against the publishing defendants "acted in bad faith, vexatiously, wantonly or for oppressive reasons." *Browning Debenture Holders' Committee v. DASA Corp., supra,* 560 F.2d at 1087.

■ The law is clear that attorneys' fees may be assessed against the losing party when action is instituted in malice and bad faith. *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 258–59, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975); *F. D. Rich Co. Inc. v. United States ex rel. Industrial Lumber Co.,* 417 U.S. 116, 129–30, 94 S.Ct. 2157, 40 L.Ed.2d 703 (1974); *Browning Debenture Holders' Committee v. DASA Corp., supra, Jackson v. Oppenheim,* 533 F.2d 826 (2d Cir. 1976); *Lichtenstein v. Lichtenstein,* 481 F.2d 682 (3d Cir. 1973); *Kinnear-Weed Corp. v. Humble Oil & Refining Co.,* 441 F.2d 631 (5th Cir. 1971). Only on such a showing is an award of attorneys' fees appropriate under Section 9(e) of the Securities Exchange Act of 1934. *See Colonial Realty Corp. v. Brunswick Corp.,* 337 F.Supp. 546, 553 (S.D.N.Y.1971) (Palmieri, J.), and cases cited. That same yardstick applies when the equitable power of the court is invoked.

■ Rule 11, F.R.Civ.P. requires an attorney who signs a pleading to represent that good ground exists to support the claim. *Peter Kiewit Sons Co. v. Summit Construction Co.,* 422 F.2d 242, 271 (8th Cir. 1969). To paraphrase Judge Pollack in *Lewis v. Varnes,* 368 F.Supp. 45, 47 (S.D.N.Y.), *aff'd,* 505 F.2d 785 (2d Cir. 1974), the office of a claim of corruption, unlawful conspiracy and unfair dealing is to seek to redress a wrong, not to find one, and since such allegations have serious repercussions in the business world, they should not be cavalierly made for their presumed *in terrorem* effect. As Judge Gurfein has indicated, the accountability Rule 11 imposes on counsel merely adds an "ethical responsibility to the conception that a claim that is baseless should not survive." *Levy v. Seaton,* 358 F.Supp. 1, 6 (S.D.N.Y.1973). The law of this circuit is that relief under Rule 11 is discretionary and requires a showing of a claim not simply lacking in merit, but bordering on frivolity. *Katz v. Amos Treat & Co.,* 411 F.2d 1046, 1056 (2d Cir. 1969). Accordingly, the yardstick is the same whether Rule 11, the equitable power of the court or Section 9(e) of the Securities Exchange Act of 1934 is relied upon.

■ The potential damage to the publishing defendants has been emphasized by defendants as a whole on this motion and throughout the course of this litigation, and it is clear to me that they are entitled to prevail on this motion. Yet their success is not necessarily transferable to the other defendants. Since the standard involved is akin to that of malicious prosecution, there must be a showing that each party in whose favor expenses and attorneys' fees are being sought has been sued in "bad faith, vexatiously, wantonly, or for oppressive reasons." *Browning Debenture Holders' Committee v. DASA Corp., supra.*

■ It is, of course, true that the lawsuit against the short selling defendants was as baseless as it has been found to have been in respect of the publishing defendants, and the former, as well as the latter, were required to spend funds unnecessarily in defense of charges that should never have

been brought. However, the requisite malice and bad faith motivation spawning the litigation against the short selling defendants have not been established. As indicated at the outset, mere baseless or misguided litigation does not suffice as a premise for taxing a plaintiff with a defendant's attorneys' fees and expenses. This litigation does not appear to me to have any destructive potential to the business and reputations of the short selling defendants. While the allegations charge these defendants with an illegal conspiracy and sharp dealings, unless the contentions were given credence by the N.Y.S.E. or the Commission in instituting formal action against them on the charges alleged in the complaint, the potential for harm to the short selling defendants, aside from the need to expend time and funds on defense as already discussed, is not evident to me. Since these defendants apparently have developed a profitable specialty in correctly predicting the future downslide of various stocks, allegations such as those made here must be the commonplace reaction of those persons who have invested heavily in a security in the expectation of its future growth. Indeed, these allegations may even enhance defendants' reputations as discerning and skillful speculators. In any event, no propensity for harm to them has been shown. As movants on the motion, the short selling defendants have the burden of proof and of persuasion, *United States v. De La Fuente*, 548 F.2d 528 (5th Cir. 1977); *United States v. Gardner*, 537 F.2d 861 (6th Cir. 1976); *Jefferson School of Social Science v. Subversive Control Board*, 118 U.S.App.D.C. 2, 331 F.2d 76 (1962); *United Pacific Insurance Co. v. United States ex rel. Mississippi Valley Equipment Co.*, 296 F.2d 160 (8th Cir. 1961); *Terukuni Kaiun Kaisha, Ltd. v. C. R. Rittenberry and Associates, Inc.*, 454 F.Supp. 418 (S.D.N.Y.1978) (Carter, J.), and that responsibility they failed to meet. Accordingly, the motion of the short selling defendants for attorneys' fees and expenses is denied.

## II

Under the standard discussed ante, attorneys' fees are awarded to the prevailing party. The remaining issue is whether the publishing defendants can be classified as prevailing in this action since the case did not proceed to a determination on the merits. The decided cases appear to be in conflict. A prevailing party has been described as one in whose favor a judgment on the merits is entered. *Pearson v. Western Electric Co.*, 542 F.2d 1150 (10th Cir. 1976); *Mobile Power Enterprises, Inc. v. Power Vac, Inc.*, 496 F.2d 1311, 1312 (10th Cir. 1974); *Vermont Low Income Advocacy Council v. Dunlop*, 71 F.R.D. 343, 345–46 (D.Vt.1976) *aff'd*, 546 F.2d 509 (2d Cir. 1976). On the other hand, it has been held that because a defendant has been put to the burden of defending a charge until it was abandoned, it was the prevailing party as to the charge. *Ellipse Corp. v. Ford Motor Co.*, 452 F.2d 163 (7th Cir. 1971), *cert. denied*, 406 U.S. 948, 92 S.Ct. 2041, 32 L.Ed.2d 337 (1972). In *Parker v. Matthews*, 411 F.Supp. 1059 (D.D.C.1976), the court held that the prevailing party is not limited to one securing a favorable judgment after trial; that under the totality of the circumstances, the prevailing party is determined by focusing on the necessity of the action and determining who is the successful party with respect to the central issues of the litigation. In those courts adopting the less restrictive definition of the prevailing party, attorneys' fees may be allowed without the necessity of the litigation going to judgment. *Mezo v. International Union, United Steel Workers of America*, 558 F.2d 1280 (7th Cir. 1977); *Kerr v. Screen Extras Guild, Inc.*, 466 F.2d 1267 (9th Cir. 1972), *cert. denied*, 412 U.S. 918, 93 S.Ct. 2730, 37 L.Ed.2d 144 (1973); *Yablonski v. United Mine Workers of America*, 151 U.S.App. D.C. 253, 260, 466 F.2d 424, 431 (1972), *cert. denied*, 412 U.S. 918, 93 S.Ct. 2729, 37 L.Ed.2d 144 (1973); *Ellipse Corp. v. Ford Motor Co., supra; Parker v. Matthews, supra*.

In *Kopet v. Esquire Realty Co.*, 523 F.2d 1005, 1008 (2d Cir. 1975), the Court of Appeals stated "[t]here is no question, how-

ever, that federal courts may award counsel fees based on benefits resulting from litigation efforts even where adjudication on the merits is never reached, e. g., after a settlement . . . [citations omitted]." While this case is not directly on point, it does stand squarely for the proposition that a final judgment is not a prerequisite for an award of attorney fees.[6]

In *Vermont Low Income Advocacy Council v. Dunlop, supra,* the court takes the restrictive view that the prevailing party is one in whose favor judgment is entered. Whatever the merits of that view in the abstract, I decline to follow it in this case.

Plaintiff had no cause of action from the outset. After litigation was instituted, plaintiff made very feeble efforts to effectuate discovery, and, indeed, did not even obtain sufficient data from Technicare to be able to meet the requirement of numerosity requisite to enable the action to be maintained as a class action under Rule 23, F.R.Civ.P. Under these circumstances a stipulation of discontinuance with prejudice, with knowledge that defendants reserved the right to continue the action until a determination was made on their motion for costs, expenses and attorney fees, constitutes a complete collapse of plaintiff's case, making defendants the successful parties on the central issue of this litigation, i. e., that plaintiff could not carry the burden of proof to establish the conspiracy among the defendants and the nexus between Abelson's articles and the short selling defendants. Accordingly, defendants are the prevailing parties and are entitled to an award of attorneys' fees.

■ The publishing defendants have shown expenditures in excess of $100,000 in attorneys' fees and expenses in defense of the action. However, an award of part of these expenditures seems to me sufficient. Accordingly, judgment of $50,000 in attorneys' fees and expenses is awarded to the publishing defendants.

The final question is against whom should the cost for attorneys fees be taxed. Both plaintiff and his counsel are culpable. Plaintiff and his broker, among others, pressured counsel into filing this baseless lawsuit, even though they and counsel knew or should have known that the allegations were not susceptible of proof sufficient in a court of law. Counsel, however, was under a professional obligation to resist his client's insistence that this lawsuit be brought, but did not. Therefore the cost of attorneys' fees will be taxed against plaintiff and his counsel, Hale & Dorr.

Rule 54(d), F.R.Civ.P. provides that costs shall be awarded to the prevailing party. I have already indicated my reason for concluding that the publishing defendants are the prevailing parties. For similar reasons, the short selling defendants are also prevailing parties and should be allowed to recover the costs of the action.

In sum, the publishing defendants are awarded $50,000 in attorneys' fees and expenses to be taxed against plaintiff and his counsel. All defendants are to recover their costs taxed against plaintiff, and pursuant to the parties' stipulation, the action is dismissed with prejudice.

SETTLE ORDER.

---

**6.** A recent opinion by the Court of Appeals, *Gagne v. Maher,* 594 F.2d 336 (2d Cir. 1979), in construing 42 U.S.C. § 1988 as amended in the Fees Act, Pub.L. No. 94–559, 90 Stat. 2641 (1976) which permits a federal court to award attorneys' fees to a prevailing party in suits to enforce 42 U.S.C. §§ 1981, 1982, 1983, 1985 and 1986, Title VI of the Civil Rights Act of 1964 or to enforce or charge a violation of the Internal Revenue Code, holds that a prevailing party need not be one in whose favor a judgment is entered. Here, however, the court was construing a federal statute and based its holding on the legislative history of the 1976 amendment to the Fees Act. Thus, this case is not directly in point, but it does provide generalized support for the view taken here that in determining who is the prevailing party, the court may include litigants other than those who obtain an adjudication on the merits.