Robert NEMEROFF, D.D.S., Plaintiff,

v.

Alan ABELSON, Meyer Berman, Robert Bleiberg, Cumberland Associates, Dow Jones & Company, Inc., Walter Mintz, Robert Wilson, Robert Wilson Associates, Defendants.

No. 77 Civ. 1472 (RLC).

United States District Court,
S. D. New York.

April 8, 1982.

---

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for plaintiff; Simon H. Rifkind, Jay Greenfield, Robert S. Smith, Adele R. Wailand, New York City, of counsel.

Patterson, Belknap, Webb & Tyler, Reavis & McGrath, Kaye, Scholer, Fierman, Hays & Handler, New York City, for defendants; Rudolph W. Giuliani, Renee L. Cohen, Andrew C. Freedman, Julius Berman, New York City, of counsel.

## OPINION

ROBERT L. CARTER, District Judge.

This case is here on remand for determination: "(a) whether appellants' conduct of the litigation was intentionally dilatory; and (b) whether at any point, during the litigation and prior to dismissal, sufficient facts became available to appellants to demonstrate that a failure at that point to withdraw the action necessarily amounted to bad faith." *Nemeroff v. Abelson*, 620 F.2d 339, 350–351 (2d Cir. 1980).

The matter has been fully argued and briefed, and supporting affidavits have been supplied. Since responses to the questions posed were to be found in the record on which this court based its prior decision, reported at 469 F.Supp. 630 (S.D.N.Y.1979), no additional evidence or testimony was adduced.

*Was the Conduct of the Litigation Intentionally Dilatory?*

The docket entries, JA 1–7,[1] show that in a 13-month period plaintiff took the deposition of Jeffrey Haas on July 19, 1977, of Richard Gilder on November 3, 1977, of Peter Reiss on November 4, 1977, of Neuberger and Berman by C. Carl Randolph on November 29, 1977, and Henry Kerr on February 21, 1978.[2] These are all non-party witnesses. No claim is made that Gilder,

---

1. Reference to JA is to the Joint Appendix filed by the parties in the Court of Appeals and filed here on remand.

2. A review of the docket entries recording plaintiff's activities is an appropriate starting point for consideration of the first inquiry. On March 25, 1977, the litigation was commenced as a class action. The original complaint charged the publishing defendants with deliberately leaking in advance of publication the contents of Abelson's disparaging articles on Technicare stock to the short selling defendants to enable them to profit from a pattern of short sales. These alleged fraudulent activities were held to contravene §§ 9(a) & (e) and 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. §§ 78i(a) & (e) and 78j(b), and Rule 10–b of the Securities & Exchange Commission issued thereunder, 17 CFR § 240.10b–5.

One defendant filed its answer on April 27, 1977, and all the defendants had filed answers

Reiss, or Neuberger and Berman advanced plaintiff's claim, and Henry Kerr is accorded significance only because defendants cite that deposition as a particularly egregious example of being caused to spend time and funds needlessly in attending a deposition that plaintiff's counsel knew well in advance would be non-productive and should have been cancelled. What is the most striking about the docket is the absence of any entry showing plaintiff's counsel noticing the deposition of a party defendant.

Gordon Walker, plaintiff's original counsel in this proceeding, began this lawsuit by giving a reporter a copy of the complaint before filing it in this court. Although the Court of Appeals implied that no actionable wrong was committed by Walker's act, the comparison of plaintiff's and his counsel's aggressiveness and diligence in seeking media coverage when the lawsuit was initiated to their aggressiveness and diligence in prosecuting the damaging claims once litigation was underway is instructive in disposing of the issue at hand.

There can be no doubt that the results of the New York Stock Exchange ("NYSE")

by May 10, 1977. On May 24, 1977, plaintiff filed a motion for class certification. The court issued a pretrial schedule order on June 2, 1977, setting January 31, 1978, as the cutoff date for completion of discovery.

On June 14, 1977, plaintiff responded to defendants' document requests and filed their own request for production of documents. On June 29, 1977, plaintiff filed notices to take the deposition of R. Furman, E. Levy, L. Rader, New York Stock Exchange ("NYSE") by Jerome Haas, E. Stassler and Neuberger and Berman by C. Carl Randolph. On July 5, 1977, plaintiff filed notice to take the deposition of Mosely, Hallgarten and Esterbrook. On July 6, 1977, plaintiff filed notice to take the deposition of NYSE by James Buck. On August 23, 1977, plaintiff moved to compel the production of documents in answer to defendants' responses and objections to plaintiff's notice to produce filed on July 22, 26, August 1 and 3, 1977. On September 22, 1977, Mark Howard and Mark Howard Associates were dismissed from the action without prejudice pursuant to a "so ordered" stipulation. On September 27, 1977, plaintiff filed a memorandum in support of the motion for class action certification. On October 6, 1977, plaintiff filed his response to defendants' second request for production of documents. On October 7, 1977, plaintiff filed notice to take the deposition of P. G. Reiss and R. Gilder, and on October 11, 1977, plaintiff filed a supplemental memorandum in support of the motion to compel production of documents. On October 19, 1977, Lawrence Bleiberg and Boxwood Associates were dismissed from the action without prejudice pursuant to a "so ordered" stipulation. On October 20, 1977, the court decided plaintiff's pending Rule 37, F.R.Civ.P., motion to compel production by limiting plaintiff's access to information concerning defendants' stock transactions solely to those activities involving Technicare including meetings, conferences and conversations for the period beginning January 1, 1975. On October 28, 1977, depositions of Neuberger and Berman by C. Carl Randolph and Lawrence Rader were again noticed. On October 31, 1977, plaintiff moved for leave to file an amended complaint and filed a reply memorandum to the motion for class certification. On November 28, 1977, a notice to take the deposition of Loeb Rhodes & Co. was filed. The October 31, 1977 motion for leave to file an amended complaint was granted on December 12, 1977, and the amended complaint was filed on January 6, 1978. On January 16, 1978, plaintiff moved to extend the discovery deadline from January 31, 1978, to October 31, 1978. On January 25, 1978, the court granted a two month extension to March 31, 1978, on the grounds that discovery had now at most been delayed two months while the court held *sub judice* plaintiff's Rule 37 motion. On January 27, 1978, plaintiff filed notice to depose H. Kerr.

On January 27, 1977, the court denied plaintiff's motion for class certification. While agreeing that "a considerable part of the confusion as to the nature of plaintiff's class has been generated by the lack of clarity in [the] original moving papers," the court disagreed with defendants' contention that plaintiff had failed adequately to define a class. JA at 1139–1140. Rather, in the court's view, defendants were contending that plaintiff had failed to define a class entitled to relief, a burden plaintiff was not required to assume at this stage of the proceedings. *Id.* The motion was denied, however, because plaintiff had failed to meet the test of numerosity, a basic prerequisite under Rule 23, F.R.Civ.P.; defendants' other arguments opposing class certification were not reached. *Id.* at 1142–47. On March 31, 1978, new counsel, Kriendler & Kriendler, was brought into the case. An enlargement of time for discovery was sought, and on April 6, 1978, plaintiff was given until April 14, 1978, to file a second amended complaint.

On May 3, 1978, a stipulation and order was filed dismissing the complaint effective June 15, 1978.

While plaintiff noticed a number of depositions, he actually deposed only Haas, Gilder, Reiss, Randolph and Kerr.

investigation were known to plaintiff and counsel by July 19, 1977. Assuming that Walker had reason to believe, until the Haas deposition revealed the contrary, that the NYSE's inquiry would support his contentions, the docket entries, prior to July 19, 1977, do not give a profile of an active litigant. Between May 10, 1977, when all defendants had filed answers, and the July 19 deposition of Haas, plaintiff filed a motion for class certification, a request for document production, and notices to take various depositions, but only the Haas deposition was actually taken in the time span.

Between July 19 and December, 1977, when the motion for class certification was argued, plaintiff had (1) filed a Rule 37 motion, and (2) had taken three insignificant depositions which amounted to a total of 177 pages of transcript and took a total of five hours and forty minutes to complete. Memo. in Supp. at 46.

It should be noted that defendants advised the court in a letter dated June 9, 1977, of the parties' agreement as of May 31, 1977, to a pretrial discovery schedule which postponed discovery on the merits until after October 28, 1977, the agreed upon date for completion of discovery on the motion for class action certification. The letter stated, however, that on learning that the court had placed a January 31, 1978 deadline on all discovery, plaintiff had advised defendants that they might want to begin discovery on the merits before October 28. JA at 989–991. Apparently, the matter was not pursued further.

This agreement does not excuse plaintiff's slothful activity before October 28, and it is particularly unacceptable as a justification for their lack of diligence after July 19. Once Walker learned that needed facts to support the merits of plaintiff's claims had to be found without the anticipated NYSE assistance, he was obligated to concentrate all efforts on finding a basis for continuing the case on the merits. Faced with a discovery deadline of January 31, 1978, and armed with no facts to support the complaint as of July 19, Walker would have been expected to be anxious, if not panic-stricken, that discovery on the merits was postponed until October 28. Yet, nothing was done to quicken the pace of discovery. Moreover, even after October 28, the pace did not change. There were the three apparently irrelevant and insignificant depositions in November, amendment of the complaint in January and the Kerr deposition in February.

Plaintiff argues that more was not done because defendants delayed responding to the motion for production of documents. The record does not support that contention. Plaintiff's Rule 37 motion was filed on August 23, 1977, and decided on October 20, 1977. With that decision the parties were apprised of the court's view as to the appropriate scope of discovery. Moreover, in its determination the court made clear that after having taken discovery within the limits being set, more leeway might be given on a showing of some concrete need. JA at 1032. However, no further application was made, and plaintiff did not press forward with discovery even within the limitations set by the court. In any event, the record fails to disclose diligent and active prosecution by Walker. In light of the seriousness of the allegations, the publicity accorded the charges and the potential damage to defendants, particularly the publishing defendants, a failure of active prosecution itself constituted dilatoriness.

Throughout the life of this litigation plaintiff had not pursued discovery very vigorously. To be sure, whatever was learned through that process was not helpful, but indicated that the litigation should have been discontinued. In August, 1977, plaintiff secured the trading reports and appointment calendars of the defendants. Except for the trading reports in which plaintiff puts much stock, only three facts were uncovered: a July 1977 article quoting Wilson about his trading habits; Wilson's presence at a meeting with a broker for Cumberland Associates, two days before the first purported instance of an alleged short sale, Abelson's derogatory article and cover pattern; and the notes of a telephone conversation between Wilson and Lawrence

Rader, a stock analyst. Plaintiff admits that this constitutes all the fruits of his pretrial discovery. Memo. in Opp. at 13–14.

First, the July, 1977 article quoting Wilson is a reiteration of the March, 1977 article noted by the Court of Appeals. *See* Memo. in Opp. at 12–13. Thus, this cannot be new information. It was already known to Walker, and his knowledge of the March, 1977 article was, in part at least, the basis for the Court of Appeals finding of good faith in the initiation of the lawsuit.

Second, the reference to a short sale subsequent to Wilson's meeting with the broker for Cumberland Associates on April 21, 1976, relates to Mintz' short sale and subsequent cover of 5,000 shares in April and May, 1976. Since Wilson did not trade, it is hard to find significance in this meeting. Clearly, no support for the allegations of a conspiracy to depress Technicare stock can be discerned from this information, and Mintz even lost on the transaction.

Third, plaintiff suggests that the telephone conversation was important because Tri-Chem and Technicare were discussed and Rader was one of the few analysts publishing unfavorable commentaries about Technicare. Rader's negative report was dated March 24, 1976, and Walker had been informed that Wilson had done a favor for Rader in March. *Id.* at 13–14. By plaintiff's and counsel's own account depositions of Rader and Wilson were needed to develop whatever pertinence this conversation might have to plaintiff's cause. Yet, the needed depositions were never taken.

Moreover, the trading records themselves indicated that the charges in the complaint lacked foundation. They showed that Wilson had never covered his short position during the relevant period, and that only one transaction by one defendant had been revealed to match the sales-article-cover scheme thesis on which the complaint was based. The NYSE had studied defendants' trading reports as a part of its investigation, and plaintiff and Walker could not reasonably have anticipated finding through their own study of these trades a pattern of conduct the NYSE had been unable to discern. Even assuming *arguendo* that it was appropriate for the trading records to be studied before a decision to discontinue was made, they produced nothing of any significance, and the litigation then should have been brought to a close forthwith.

With all that plaintiff learned after the case was filed calling for withdrawal and no countervailing information on hand, in filing the motion for leave to amend, in pressing the motion for class action certification, particularly without even meeting Rule 23, F.R.Civ.P. requisite of numerosity, in filing the amended complaint and in securing an extension of the discovery deadline, plaintiff and his counsel were guilty of dilatoriness in the sense of prolonging the litigation by delaying what was then obvious—a decision to terminate.

The subsequent Kerr deposition was dilatory and wasteful in two respects. It was held when counsel knew Kerr was not able at that time to assemble the data desired, and even assuming Kerr's deposition disclosed a sufficient number of Technicare stockholders sustaining losses to meet the numerosity requirements for class certification, plaintiff had nothing to tie defendants to the injuries of the putative class. Even had the latter hurdle been overcome, plaintiff might, at best, have obtained an order certifying a class in a moribund case.

The court's assessment, therefore, is that handling of the litigation after the filing of the complaint was dilatory in that the case was not prosecuted diligently, and plaintiff's desultory activities merely served to delay the termination of the lawsuit. Before he filed his complaint Walker was aware of the seriousness of the allegations he was about to file and the potential damage such charges might do to Abelson and Barron's. His March 14, 1977 telephone conversation, cited by the Court of Appeals *see* 620 F.2d at 346–47 n.11, and by this court, *see* 469 F.Supp. at 635, with Richard Grimm, President of Technicare, makes that clear. Knowing that he was dealing with hazardous material, his sense of responsibility should have led him to under-

take a flurry of pretrial discovery aimed at quickly uncovering all discoverable facts to support the claims. Indeed, it is not uncommon in situations of this kind, where a claim of a pattern of wrongful conduct is made, for the aggrieved party to seek a court order allowing discovery before the time has elapsed for defendants to answer or otherwise respond. Plaintiff filed no such motion.

Whatever reasons may have existed for keeping the litigation alive prior to July 19, 1977, disappeared thereafter. Plaintiff obtained no information or material after July 19 that warranted going forward with this case, and what was acquired pointed to the need for termination. Instead of accepting this fact and discontinuing the litigation, plaintiff prolonged it, keeping it alive on the court calendar without making any respectable effort to secure support for the allegations through discovery. In response to the first inquiry, therefore, the court concludes that the handling of this case was dilatory once it was filed.

*At any point during the litigation prior to dismissal, did sufficient facts become available to demonstrate that a failure at that point to withdraw the action necessarily amounted to bad faith?*

After counsel gained the knowledge which should have indicated to him that the damaging allegations could not be supported, he cannot withstand a charge of bad faith in continuing the litigation absent a showing of some reasonably aggressive effort to supply what had not been forthcoming from the NYSE investigation. Since, as has been indicated, no such effort was made, failure to discontinue the case on July 19, 1977, or within a reasonable time thereafter is conclusive evidence of bad faith. The NYSE report stated that NYSE was investigating charges that "certain analysts" were in collusion with various hedge funds and "were writing bearish reports containing inaccurate facts in order to demoralize" trading in Technicare common stock. JA at 276. Howard Roth and George Georges were identified as the sources of these charges, and Herbert Stein

and Gale Donovan were also cited as providers of similar information. The investigators had met with Ronald Meadows and William Carlson of Technicare and with the SEC and the American Stock Exchange "in order to evaluate, discuss and coordinate the method of investigation." *Id.* at 277. The NYSE team had questioned persons on and off the record, had and was continuing to gather customer statements and accounts to determine whether "an established pattern emerges to support these charges." *Id.*

The report continues:

It should be established that from the very outset of these investigations, [NYSE] has been aware that the allegations have been of an extremely serious *but broad nature.* Little has been provided as to hard evidence by persons with direct knowledge of conspiratorial efforts representing themselves to substantiate these allegations. Rather up to this point, it has been found that differences in opinion between those positive on the merits of [Technicare] and those with conflicting views provide the base of these charges. Direct violation of Exchange rules or SEC Regulation have not been established. (emphasis in the original)

*Id.* at JA 277–78.

Counsel now seek to discount the significance of this report in evaluating the bona fides of plaintiff's and his counsel's conduct, but the arguments ring hollow. All the information Walker had to support the filing of the lawsuit had been made available to NYSE. All of his sources had provided the NYSE with whatever information had previously been given to him. Walker had no other data to establish proof of the alleged conspiracy and illegal manipulations charged to the defendants in this case. As of July 19, 1977, Walker was made aware of the contents of the report and of the depositions taken, trading records and documents reviewed and charts prepared by NYSE in its investigation to determine whether any correlation existed between Abelson's columns and the short selling of Technicare by

the non-publishing defendants. This report and its accompanying documents meant that Walker could not rely on Roth, Donovan, Stein and Georges to assist in sustaining the burden of proof concerning defendants' alleged fraudulent activities, as he had assumed when the litigation was initiated. It also meant that it was unlikely that the trading records of the short selling defendants would reveal anything helpful in meeting plaintiff's burden of proof requirements.

There is nothing in the record to show that plaintiff had anything viable in the way of facts or information to keep this case alive after hope of the NYSE confirming counsel's belief that defendants were engaged in concerted wrongdoing proved to be misplaced. Moreover, counsel have not pointed to any specific credible information known to Walker at the time he learned of the NYSE report to justify keeping the litigation alive.

The *Business Week* matter had been resolved with a retraction, and thus plaintiff could take no comfort that defendants had been found guilty of prior similar acts, since, on the contrary, they had been vindicated. Moreover, if Walker believed Abelson was leaking his conclusions to the other defendants via the telephone, one would surely have expected defendants to have been subjected to searching examination on the number, frequency and content of communications among Abelson and the short selling defendants.

The argument that the report, if critically significant, would have prompted defendants to seek summary judgment is unpersuasive. Nemeroff's ignorance of the basis for the allegations in the complaint was virtually total. He relied wholly on his counsel and the character of Walker's conduct can only be assessed on the basis of what he knew and did. When the matter was initially argued here, Walker stressed the importance of the NYSE ongoing investigation and his reliance upon it as evidence of his good faith in instituting the lawsuit. Here and on appeal, as justification for bringing the lawsuit, Walker also cited a February, 1977 conversation with Haas leading him to believe, albeit mistakenly, that the NYSE had found a correlation between the short selling defendants' market maneuvers and Abelson's articles. The NYSE investigation was clearly of crucial significance to Walker's view of what could be relied upon to prove the allegations. Accordingly, it is misleading to contend that defendants, particularly at the commencement of discovery, could have been in the same epistemic condition as Walker. They did not know what sources plaintiff was depending upon, or what evidentiary proof plaintiff proposed to offer to substantiate the claims made. They could not have been aware of the devastating blow the NYSE report must have had to Walker's confidence that he could prevail with these allegations. Defendants learned of Walker's critical reliance on the NYSE investigation only after plaintiff was required to answer the claim that a baseless lawsuit had been instituted.

Counsel also contend that where a claim turns on documentary evidence, summary judgment is appropriate, and that "deposition testimony is inapplicable insofar as the motion utilizes documentary evidence." Memo. in Opp. at 28. Defendants had no reason to conclude that plaintiff was relying solely on documentary evidence to support the assertions in the complaint. Indeed, plaintiff's counsel could not have had any reasonable expectation that his burden of proof could be met on documentary evidence alone. He had to establish at least a correlation between defendants' acts and consequent injuries. More than documentary evidence was required to establish that nexus. On January 16, 1978, plaintiff, representing that more time was needed, sought to extend discovery six months beyond its scheduled cutoff date. By this action it seems clear enough that if a motion for summary judgment had been filed, plaintiff would have sought more time for discovery to respond to the motion. Undoubtedly the motion would have been denied to afford plaintiff a reasonable time to complete discovery. This is the commonplace result. *See, e.g., Gall v. Exxon*, 418 F.Supp. 508, 520 (S.D.N.Y.1976) (Carter, J.).

Counsel suggest that plaintiff was not bound by the NYSE report. It is, of course, true as an abstract proposition that a private litigant is not governed by an agency's findings. However, we do not examine plaintiff's conduct in a vacuum or on an unmarked slate. It is now clear that the only proof plaintiff possessed was information which the NYSE had rejected as insufficient. Plaintiff, as counsel indicate, had a right to seek discovery apart from the NYSE and to reach independent conclusions about defendants' conduct. That, however, is precisely what was not done. Rather the lawsuit was kept alive without any reasonable effort being made to determine whether a viable alternative source of support for the claims could be found.

It is suggested that during the course of discovery plaintiff obtained evidence warranting continuation of the lawsuit. This evidence, culled from a review of defendants' trading records and appointment calendars, is alleged to be short sales by Mintz and Berman before and after Abelson's columns; Wilson's "enormous short position in Technicare; and meetings between short sellers within two to three weeks and sometimes within days of short selling by defendants." Memo. in Opp. at 10. While the defendants' statement that the trading records "provided irrebuttable documentary evidence that the charges were false," Memo. in Supp. at 30, is probably excessive, the records supply no particular support for the claims. It should be remembered that these documents were produced in August, 1977, after the NYSE report had been seen by counsel and defendants had held at least one deposition session with Nemeroff and Roth.

The trading records were summarized in a chronology, see JA at 530–568, presented to the Court of Appeals which apparently contained some inaccuracies and was revised as JA Supp.[3] Defendants challenge the revisions. For our purposes we accept the revisions as accurate. The revised listing shows that Wilson, the supposed ringleader of the conspiracy and holder of the largest short position in Technicare, never made a single sale of Technicare stock close to an offensive Abelson article, see JA Supp. at 537X–543X, and indeed that his only trade in Technicare stock came in October, 1976, far removed from any cited Barron's column, id. at 530X–36X, 537X–543X. Mintz' only trading in Technicare close to an Abelson article consisted of a short sale of 5,000 shares on April 23, 1976, and a sale and cover in May and August, 1976. The May and August short sales, however, came after, not before, public dissemination of Abelson's articles. Otherwise, he had no position in Technicare from late May to December, 1976. See id. at 531X–535X. Berman sold no Technicare stock until June, 1976, a month after Abelson's first relevant article, and after covering most of his position that same month, he did not trade again until October, 1976. See id. at 532X–534X.

October 18, October 22, October 27, December 22, 1976, and February 15, 1977, were the only days on which any two short selling defendants traded simultaneously. On October 18, Berman sold 500 shares and Wilson shorted 4,500 shares. On October 22, Berman and Wilson had appointments to meet; Wilson shorted 4,500 shares and Berman covered his October 18 trade. On October 27, Wilson shorted 3,900 shares and Berman shorted 500 shares; Wilson and Abelson dined together. Id. at 534X. On December 22, Berman covered 700 shares, id. at 535X; Mintz shorted 3,000 shares, id. at 536X; and on February 15, 1977, Mintz covered 5,700 shares and Howard shorted id. at 536AX. No pattern can be gleaned from that chronology. Short sales sometimes followed and sometimes preceded a Barron's article on Technicare, for example, Mintz sold short on May 3, 1976. Id. at 532X. The Abelson article in the May 3, 1976 Barron's was on the newsstands on Saturday, May 1. This sale was covered three weeks later and, significantly, result-

---

3. Reference to JA Supp. is to the Joint Appendix Supplement which is a revised summary of the defendants' trading records prepared by plaintiff and filed with the Court of Appeals and here on the remand.

ed in substantial losses. *Id.* at 547X. Mintz sold short on August 16, 1976, *id.* at 533X, again after the appearance of an unfavorable article in Barron's August 16 issue, which was on the newsstand on Saturday, August 14. Berman sold 1,000 shares short on June 1, 1976, and another 1,300 on June 8. *Id.* at 532X. Abelson's article appeared in the June 14 issue of Barron's.

Plaintiff's contention that appointments or meetings took place "between short sellers and Abelson within two or three weeks of Abelson columns ... and sometimes within days of relevant trading by the short sellers," Memo. in Opp. at 10, is something of a bootstrap argument. Reliance is placed on defendants' appointment calendars to show such meetings. Yet, there were no inquiries of defendants to ascertain whether the meetings had in fact occurred. The listing of appointments thus is inconclusive.

Moreover, plaintiff has not elucidated the importance of the purported meetings. Counsel state that on April 13, 1976, "Wilson and Abelson met at a time when Wilson had a short position of some 100,000 shares of Technicare and faced substantial losses." *Id.* at 11. That meeting was neither preceded nor followed by trading by Wilson. Counsel then refer to a short sale ten days later by Cumberland Associates, the Mintz' hedge fund. *See id.* Mintz made another short sale May 3, 1976. The significance or relevance of the Wilson, Abelson meeting to Mintz' trading and Wilson's large short position is hard to discern.

Plaintiff cites a May 19, 1976 Abelson appointment with Berman and alleges that on May 26, 1976, Abelson met or had an appointment with Mintz; between June 1 and June 8, Berman sold short 2,300 shares; on June 12, a negative Abelson column appeared; and on June 24–25, Berman covered 2,600 shares. *See id.*; JA Supp. at 532X. I do not understand in what way the above advances plaintiff's argument. Mintz did no trading during the period, Memo. in Opp. at 10; JA Supp. at 532X, 547X, and Berman suffered substantial losses. Between June 1 and June 8, the latter sold 2,300 shares

short at a range of 37⅞ to 40⅝ per share and covered 2,600 shares at a range of 44⅞ to 46⅜. JA Supp. at 544X.

The third reference is to short sales of 8,000 shares by Mintz between December 14–22, 1976. *See* Memo. in Opp. at 11. Plaintiff cites a Mintz appointment with Abelson on December 22. Counsel state: on December 27, 1976, Berman sold short, and on January 8, 1979, a negative Abelson article appeared; Berman covered 1,700 shares, and on January 19, 1977, Cumberland covered 2,000. *Id.*; JA Supp. at 535X–536X, 536AX. The parties made a net profit on these transactions, but Berman sold short 1,000 shares as well as covered the indicated 1,700 shares during the January 10–12 period, Memo. in Opp. at 10; JA Supp. at 545X, and Mintz, on January 19, 1977, covered only 2,000 shares of the 8,000 short sales made in the December 14–22 period, Memo. in Opp. at 10; JA Supp. at 535X–536X, 536AX. Thus, the evidence is far from compelling.

The final example refers to a January 25, 1977 Abelson meeting or appointment. The next day Cumberland sold 4,000 shares short. On February 12, a negative column appeared and between February 15–17 Cumberland covered. Memo. in Opp. at 12. Mintz sold short 4,000 in January at 34⅞ and covered some 10,000 shares on February 15–17 at prices ranging from a low of 36⅝ to a high of 37⅞. JA Supp. at 547–548X. Thus, these transactions record a substantial loss. Moreover, some of the listed appointments may have been cancelled.

Plaintiff's exercise is no more successful in revealing a reliable pattern of short sales and cover purchases bracketing negative Barron's articles than the NYSE's investigation that utilized substantially similar data. Furthermore, it would clearly be insufficient and manifestly unfair to hold the allegations in the complaint validated even if a few illustrations of a short sale-article-cover pattern was established. Defendants were engaged in a welter of trading activities; a few examples of a short sale-article-cover could be expected as an incident of these activities and could not be regarded

as surprising. The record shows that where similar sale and cover by two short selling defendants occur close to an Abelson article, defendants either did not cover their entire position, sold short as well as covered, or lost on the transaction.

Plaintiff and his counsel were not justified in continuing this case after receipt of the NYSE report caused their hopes to collapse. The argument that defendants' appointment calendars and trading records revealed information substantial enough to keep the case alive is less than persuasive. As stated earlier, plaintiff and his counsel could not in good faith have anticipated that they could succeed in finding these records of significance when NYSE had not. Indeed, that the contention lacks merit is underscored by the failure or refusal to depose defendants or otherwise pursue the relevance of what was supposedly gleaned from the reports and appointment calendars.

In addition, there are specific indices of bad faith. Keeping Robert Bleiberg in the case after his brother Lawrence had been dropped as a defendant was surely bad faith. Robert was named a defendant because he was editor of Barron's and his brother's hedge fund had taken a short position and cover after an Abelson article. Memo. in Opp. at 18; Affidavit of Walker, JA at 143, 147; NYSE Report, *id.* at 279. Plaintiff asserts that Walker had this information when he commenced the litigation and that the information was subsequently confirmed. Memo. in Opp. at 18–19. Once the brother was removed, however, the only basis for keeping Robert as a defendant was his position as editor of Barron's. Counsel now argue that since the editor was represented by Barron's counsel, his "own fees apparently were zero." Memo. in Opp. at 19 n.22. This comment must mean to imply that since the defendant had free counsel, he suffered no injury by being kept in a lawsuit charging him with fraud and illegal conduct and that failing to dismiss him from the lawsuit is irrelevant to the issues before the court. Robert's continued involvement in a suit alleging such egregious conduct clearly imposed unjustifiable

harm on him and plaintiff's failure to dismiss in the circumstances is indicative of bad faith. Having named Barron's and Abelson, there was no justification for keeping Robert Bleiberg in the case simply because he was Barron's editor. There is nothing in this record to show that the editor had authority to review or revise any of Abelson's assessments. Bleiberg should have been dropped when the case against his brother was dismissed.

The other specific indices of bad faith were proceeding with the class action motion without meeting the elemental prerequisites of Rule 23, F.R.Civ.P., moving for leave and filing an amended complaint, reporting in the amended complaint some of the previously alleged claims of misconduct which Walker now surely knew were untrue, seeking an enlargement of discovery and scheduling the Kerr deposition, all at a time when the case had collapsed on the merits.

In answer to the second inquiry, the court finds that continuation of this litigation after July 19 was conclusive on the issue of plaintiff's bad faith, and, in addition, plaintiff is guilty of specific discrete acts evidencing bad faith in the conduct of this litigation.

*Relief*

The original opinion was concerned with the power of the court to award attorney fees where the action has been instituted in bad faith. Although the cases cited in the court's prior opinion on that issue, 469 F.Supp. at 640 41, are relied upon here, *see also, Miller v. Schweickart,* 413 F.Supp. 1059, 1061–62 (S.D.N.Y.1976) (Weinfeld, J.), it is clear that a federal court's power to impose sanctions for bad faith litigation is not restricted to the initiation stages of the controversy, but may be also levied where bad faith is found in the conduct of the litigation. *Roadway Express, Inc. v. Piper,* 447 U.S. 752, 766, 100 S.Ct. 2455, 2464, 65 L.Ed.2d 488 (1980), *citing Hall v. Cole,* 412 U.S. 1, 15, 93 S.Ct. 1943, 1951, 36 L.Ed.2d 702 (1973), and *Browning Debenture Holders' Comm. v. DASA Corp.,* 560 F.2d 1078,

1088 (2d Cir. 1977); *Hutto v. Finney,* 437 U.S. 678, 689 n. 14, 98 S.Ct. 2565, 2573 n. 14, 57 L.Ed.2d 522 (1978); *cf. Link v. Wabash Railroad Co.,* 370 U.S. 626, 632, 82 S.Ct. 1386, 1389, 8 L.Ed.2d 734 (1962) ("well acknowledged" inherent power of the court to levy sanctions in response to abusive litigation).

In awarding sanctions, it would obviously be inappropriate to require plaintiff and counsel to reimburse defendants for any extravagant and unnecessary expenditures. *Blank v. Talley Industries, Inc.,* 390 F.Supp. 1, 4 (S.D.N.Y.1975) (Weinfeld, J.). The proper measure for an award is the "cost of services and research reasonably required[.]" *Browning, supra* at 1088.

In light of the court's conclusion that plaintiff should have terminated the lawsuit on July 19 or within a reasonable time thereafter, defendants' award will be based upon all attorney fees and expenses that they were required to expend to defend this lawsuit after that date.

The publishing defendants have submitted affidavits and time charts showing 1,254.15 hours spent by counsel on this matter since July 19, 1977, of which 556.5 hours constituted partners' time and 697.65 constituted associate and paraprofessional time. The average hourly rate was $78.85. The total time expended in opposing the class action motion was 366.25 hours, of which 145 hours constituted partners' time and 221.25 hours constituted associates' time and the average hourly rate was again $78.85 per hour. The legal fees billed in this phase of the case were $27,883.75. The total fees billed since July 19 were $98,925.25.

The average hourly rate seems reasonable, even modest by New York standards.

Expenditures to oppose the motion for class certification are properly considered among the costs and expenses the publishing defendant should not have been required to bear. Since the award originally assessed was not intended to reimburse the publishing defendants fully for attorney fees and costs expended, I see no reason to modify the sanction initially levied. Accordingly the award of $50,000 in attorney fees and expenses levied against plaintiff and his counsel in favor of the publishing defendants is reinstated.

In the original opinion no award of attorney fees was made for the short selling defendants because the basis of the award was the wrongful conduct of plaintiff in instituting the lawsuit to silence the publishing defendants and the damage to the latter in the public dissemination of the charges alleging untruthful and corrupt reporting. It was felt that no similar injury had been established in respect of the short selling defendants. *See* 469 F.Supp. at 640–41. However, continuation of the litigation in bad faith after July 19, 1977, was as injurious to the short selling defendants as to the publishing defendants. They were required to expend funds in defending a meritless lawsuit prosecuted dilatorily and kept in court in bad faith and without reasonable justification. Under the circumstances, they are entitled to an award of attorney fees and expenses as well.

Julius Berman, counsel for Meyer Berman, has submitted an affidavit showing that after July 19, 1977, 66.11 hours of attorneys' time, 47.75 of which was by Julius Berman, himself, were expended in the defense of this action for a total $6,554 in fees and $2,120.06 in disbursements. The court is informed that these fees are so modest because counsel is the brother of the defendant and because the defendant did much of the leg work which would ordinarily have been performed by counsel. An award of $6,000.00 in attorney fees and expenses against plaintiff and counsel is made in favor of Meyer Berman.

The affidavit of Andrew C. Freedman, attorney for Robert Wilson and Robert Wilson Associates, shows that from July 19, 1977, through April 28, 1978, these defendants paid $36,252.50 in attorney fees for 532.6 hours of lawyer's time. 521.5 hours was time spent by associates and paraprofessionals and the average hourly rate was $68.17 per hour. The fees cover representation from after the deposition of Haas

through the filing of the stipulation of dismissal. In addition, defendants' disbursements were approximately $7,000 of which only $2,500 is attributed as caused by plaintiff. Under the circumstances an award of $20,000 in attorney fees and expenses taxed against the plaintiff and his counsel in favor of defendants Robert Wilson and Robert Wilson Associates seems appropriate.

Since Walter Mintz and Cumberland Associates have withdrawn their application for an award of attorney fees, no action need be taken in that regard on their behalf.