### UNITED STATES of America
### v.
### Liborio MILITO, Defendant.
### Nos. 84 CR 189, 85 CV 2641.

United States District Court,
E.D. New York.

June 30, 1986.

---

Reena Raggi, U.S. Atty., E.D.N.Y., and Edward A. McDonald, Organized Crime Strike Force, E.D.N.Y., Brooklyn, N.Y. by Douglas E. Grover, Sp. Atty., for U.S.

Saxe, Bacon & Bolan by Michael Rosen, New York City, for defendant.

## MEMORANDUM AND ORDER

PLATT, District Judge.

Following his plea of guilty on March 20, 1984, pursuant to a plea agreement, to a two-count information charging him with one count of income tax evasion (26 U.S.C. § 7201) and one count of aiding and assisting in the preparation and filing of his wife's false income tax return (26 U.S.C. § 7206(2)) in satisfaction of all criminal charges arising out of the investigation into the defendant's purchase and sale of automobiles, tampering with odometers, income tax evasion and filing of false returns, it was agreed that defendant would be given an opportunity to attempt to resolve his civil tax liability prior to sentence.

Two months and twelve days later, *i.e.*, on June 1, 1984, defendant appeared for sentence with his attorney, Michael Rosen, Esq., who responded in the negative to the Court's opening question: "Any reason we shouldn't proceed with sentencing, counsel?" Transcript, p. 3.

The Court next pointed out to Mr. Rosen that his client had denied to the Probation Officer preparing his presentence report that he attempted to evade taxes. The Court then offered to give the defendant a jury trial not once, but three times. Tr., pp. 4, 5 and 6. These offers were declined. There then ensued a lengthy discussion about the amount the defendant owed to the IRS and his counsel's admission that he owed "some $25,000 for those two years" which "with penalties and interest, it would probably go double" (*i.e.*, $50,000), Tr., p. 16, but defense counsel made no claim that

defendant had paid or tendered any amount in satisfaction of his liabilities.

Noting specifically that this is a particularly "willful" case with taxes owed ranging between $25,000 (admitted) and $600,000 (claimed), the Court imposed a three-year prison sentence with a five-year probationary period to follow and $15,000 in fines.

By notice of motion served and filed on July 16, 1984, defendant moved pursuant to 28 U.S.C. § 2255 to vacate this sentence on the ground (*inter alia*) that the Government failed to turn over to him prior to sentence certain MV–50 forms and MV–50 summaries in alleged violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). In an affidavit sworn to July 16, 1985, Mr. Rosen said in pertinent part that "[t]he defense was deprived of the Special Agents' workpapers in question and the critical data contained therein throughout this litigation.... [T]here could be no *Brady* material more crucial in the Government's possession than workpapers of the Special Agents that corroborated the defendant's contention that in fact he was responsible for declaring only $1700 additional income for 1978 and approximately $23,000 for 1979 that he received as his agent's commission for selling the vehicles at auction."[1]

In answer to these contentions, Special Attorney Douglas Eric Grover in an affidavit sworn to August 6, 1985, averred that such allegations were "deceptive, to say the least," and that "[p]rior to the plea of guilty, the defense was given an opportunity to inspect and copy, if necessary, every document the government had in its possession ... [and that he] personally informed Messrs. Rosen and Portnoy that these documents would be made available to both them and the Internal Revenue Service, pursuant to the plea agreement, for purposes of resolving the civil obli-

gations. Since the plea, no one has contacted my office for access to any documents."

In the reply affidavit sworn to September 19, 1985, Mr. Rosen, while admitting that "since the plea no one has contacted his [Grover's] office for access to documents," "had these summaries or the MV–50s been timely disclosed" in compliance with *Brady*, "a much different picture of the scope of the offense would have been presented at the time of sentencing by the defense...."

The Government in its papers argued alternatively that even if the "critical workpapers" had been withheld from the defense, the information contained therein "in no way tends to support the defense."

Given these contentions, the Court on the oral argument on October 11, 1985, offered Mr. Rosen a hearing on condition that if his contentions were without merit he would have to reimburse the Government at the rate of $150 an hour for attorneys' fees for the additional time required for such hearing.

At the conclusion of such argument, the Court referred to a United States Magistrate the question of whether the Government withheld *Brady* material and agreed that Mr. Rosen had an obligation to show the Magistrate how the so-called *Brady* material would materially affect the case in any way.

■ Following a hearing held on November 22, 1985, U.S. Magistrate John Caden filed a report and recommendation dated April 5, 1986, in which he made the following findings and conclusions:

1. Under *Brady*, the government may not withhold material favorable evidence specifically requested by the defense. (Pp. 6–7.)

---

1. In his most recent comunication to this Court, *i.e.*, a letter dated June 13, 1986, Mr. Rosen "objects to the characterization [by Magistrate Caden] of his claim as a *Brady* violation rather than a sentencing based on material misinformation as in *United States v. Stein*, 544 F.2d 96,

102 (2d Cir.1976)," but there can be no question but that *Brady* formed the basis of petitioner's original motion wherein it is cited in three separate places in Mr. Rosen's supporting affidavit and wherein there is no mention of the *Stein* case.

2. There is no evidence in the record that the defendant requested, or even inquired as to whether the government had copies of the MV–50 reports. (P. 9.)

3. The MV–50's or summaries, would have been of limited value to the Militos in their presentations to the court, and would not have affected the outcome of the sentencing. (P. 9.)

4. The information contained in the MV–50's and summaries does not in itself assist the defense and could not have assisted the defense at the time of the plea and sentence in the absence of a subsequently obtained exhibit which was not in the government's possession. (Pp. 10–11.)

5. Even if the MV–50's were favorable and material to the defendant's case on the issue of punishment, the court still must not grant the relief requested because the MV–50's and summaries were not suppressed by the prosecution. (P. 11.)

6. The defendant knew of and could have gotten access to the MV–50's or the equivalent information if he had made the effort. (P. 13.)

These findings and conclusions are fully supported by the evidence and the law and Magistrate Caden's report and recommendation must be accepted, adopted and affirmed, and defendant's motion to vacate the sentence previously imposed by this Court must be and hereby is in all respects denied.

Subsequent to the filing of the Magistrate's report and recommendation the Government, by letter dated May 19, 1986, has applied for attorneys' fees on the ground that the defendant's motion to vacate his sentence was "totally without merit."

At the outset of the hearing before Magistrate Caden Mr. Rosen took the position that he did not think that this Court's ruling that his firm should be liable for attorneys' fees in the event that the motion was without merit was "a proper ruling." Tr., p. 3.

Section 1927 of Title 28 of the United States Code provides in pertinent part that:

Any attorney ... who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses and attorneys' fees reasonably incurred because of such conduct.

Although § 1927 sanctions have usually been imposed in civil cases, in at least two recent cases the Ninth Circuit has applied the statute in criminal cases as well. *United States v. Austin,* 749 F.2d 1407, 1408 (9th Cir.1984); *United States v. Blodgett,* 709 F.2d 608, 610–11 (9th Cir.1983).

While the Second Circuit has not yet applied § 1927 in a criminal context, it has stated that the imposition of sanctions under § 1927 "is highly unusual and requires a clear showing of bad faith...." *State of West Virginia v. Charles Pfizer & Co.,* 440 F.2d 1079, 1092 (2d Cir.), *cert. denied,* 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971). *See also Pepsico Inc. v. Dunlop Tire & Rubber Corp.,* 578 F.Supp. 196, 201 n. 10 (S.D.N.Y.1984); *Steinberg v. St. Regis Sheraton Hotel,* 583 F.Supp. 421 (S.D.N.Y. 1984).

Moreover, this Court has an inherent equitable authority to sanction a losing party who "has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Roadway Express, Inc. v. Piper,* 447 U.S. 752, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980). The Second Circuit has held that under the court's inherent equitable powers, attorneys' fees should not be awarded unless there is "'clear evidence' that the claims are entirely without color *and* made for reasons of harassment or delay or for some other improper purposes." *Nemeroff v. Abelson,* 620 F.2d 339, 348 (2d Cir.1980), *on remand,* 94 F.R.D. 136 (S.D.N.Y.1982), *aff'd in part, rev'd in part,* 704 F.2d 652 (2d Cir.1983). It seems clear from the foregoing and other cases that the Court has the power to impose attorneys' fees, both under 28 U.S.C. § 1927 and under its inherent equitable powers, if there has been "a clear showing of bad faith."

Defendant's motion to vacate sentence under and pursuant to 28 U.S.C. § 2255 was made on the ground that the prosecuting attorney failed to turn over the MV–50s and summaries thereof in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and not on the ground of newly discovered evidence, to wit, Exhibit 3, which allegedly was "found" by Mrs. Milito subsequent to the imposition of sentence by this Court. Exhibit 3, according to Magistrate Caden, is a letter on Castleton Autorama stationery signed by one John Busacco which purports to be an agreement between the Militos and Castleton Autorama whereby the Militos would be agents of Castleton Autorama making only $50 per car in commission for all cars sold for Castleton Autorama. The Exhibit 3 produced at the hearing before Magistrate Caden was a pink carbon copy of a letter on Castleton Autorama stationery dated May 1977 (two years prior to the first of the two tax years in question); providing, in part, "[t]o anybody concerned, this letter states that Louis Milito would represent us Castleton Autorama at any and all car auctions as our agent making $50.00 fee out of the proceeds of each sale of Castleton Autorama's cars and the balance of the money paid to us immediately. [Signed] John Busacco." This copy was never authenticated at the hearing.[2]

■ Using this belatedly "discovered" Exhibit 3, defendant now says that it proves he had, for the two years in question, an "additional" $900,000 of expenses over and above the $750,000 (not apparently claimed on his or his wife's tax return but) allowed by the Government prior to plea and sentence on the basis of money orders drawn from Mrs. Milito's account and signed by Castleton Autorama, as shown in Government Exhibit 8. The $900,000 of "additional" expenses defend-

ant now claims is based on the theory that the Militos made only a $50 profit on each Castleton Autorama car sold. In order to sustain defendant's present contention that there was a *Brady* violation and now also a *Stein* violation and that his tax liability was substantially less than $25,000, *i.e.*, approximately $6,900, defendant adds the $750,000 of "Castleton" expenses computed by the Government on one basis to $900,-000 of "Castleton" expenses computed on another basis and subtracts the aggregate from defendant's gross receipts. Charitably characterizing this obvious further "error" by the defendant as "not correct," Magistrate Caden found that allowing either the unclaimed $900,000 or $750,000 (but not both) of expenses "would still leave taxes owed of somewhere between $25,000 and $600,000 [in reality closer to the latter figure], which is exactly what Judge Platt considered in determining the sentence." Fn. 4, pp. 16 & 17. Simply stated, defendant's motion appears to be based on nothing more than a present attempt to duplicate expenses.

In light of the foregoing, it strikes this Court that Mr. Rosen must have known that Exhibit 3 would have been useless in any more meaningful calculations of the defendant's tax liability for the years in question. Moreover, it seems equally clear to this Court that the MV–50s and summaries thereof allegedly "suppressed" by the Government were equally useless. It is difficult to escape the conclusion that Mr. Rosen knew, or certainly should have known with the exercise of reasonable effort, that the defendant's motion was (as it turned out to be) wholly without merit and may not be said to have been made in good faith.

Accordingly, this Court grants the Government's application for attorneys' fees and expenses expended on the motion

---

**2.** The record indicates that a serious question exists whether "Castleton Autorama" was nothing but a name or entity, used by the Militos in the years in question to conduct their car business. The former landlord of that firm testified that while it was a car "body shop" in 1977 and 1978, in 1978 or 1979 it was raided by the police and "went out of business." He was told that it "was being operated as a chop-shop." (Tr. pp. 16–24.) The Government claims it "graciously" gave the Militos the benefit of the doubt on this question. Had it not done so, it could have tenably argued that none of the "expenses" should be allowable.

to vacate sentence and grants the Government's application for an award of $3,855 in this connection.

SO ORDERED.